1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                        DISTRICT OF OREGON

9                        PORTLAND DIVISION

10

11

12   LEE AMBROSE,                         No. 3:12-cv-01740-HU

13            Plaintiff,                            **OPINION AND**
                                                        **ORDER**
14       v.

15   J.B. HUNT TRANSPORT, INC., a
     foreign corporation
16
              Defendant.
17   _____

18   Larry L. Linder
     John D. Burgess
19   The Law Office of Larry L. Linder, LLC
     2245 Commercial St. NE
20   Salem, OR 97303
     Telephone: (503) 585-1804
21   Facsimile: (503) 585-1834

22       Attorneys for Plaintiff

23   Michael T. Garone
     Jean Ohman Back
24   Stephanie P. Berntsen
     Schwabe, Williamson & Wyatt, P.C.
25   Pacwest Center
     1211 SW 5th Ave., Suite 1900
26   Portland, OR 97204
     Telephone: (503) 222-9981
27   Facsimile: (503) 796-2900

28       Attorneys for Defendant


     Page 1 - OPINION AND ORDER

HUBEL, Magistrate Judge:

This case arises out of an employment dispute between Plaintiff Lee Ambrose ("Plaintiff") and his former employer, Defendant J.B. Hunt Transport, Inc. ("Defendant"). Defendant now moves, pursuant to Federal Rule of Civil Procedure ("Rule") 56(c), for summary judgment on Plaintiff's exclusively state law claims for violation of the Oregon Family Leave Act ("OFLA"), disability discrimination, failure to engage in interactive process, and workers' compensation discrimination. For the reasons that follow, Defendant's motion (Docket No. 32) for summary judgment is granted in part and denied in part.

## I. FACTS AND PROCEDURAL HISTORY

Sometime in 2005, Plaintiff was driving a commercial truck for Vic West Steel, when he began to experience an accelerated heart rate, excessive sweating and nausea ("the 2005 incident"). Plaintiff received a clean bill of health after being examined by a cardiologist and his own physician. In early to mid-2006, Plaintiff had a similar episode while driving, where he experienced an accelerated heart rate, excessive sweating and shortness of breath ("the 2006 incident"). Plaintiff's dispatcher once again told him to consult with a doctor to determine the root cause of these episodes. Plaintiff did so and ultimately underwent a catheter ablation in May of 2006.[1]

---

[1] As Defendant's counsel explained during oral argument, "a catheter ablation is where . . . a catheter is inserted in the groin, goes up through the artery, into the heart, and then the surgeon . . . kills a part of the heart muscle in order to eliminate [an arrhythmia issue] that a person may have." (Mot. Summ. J. Hr'g Tr. 3, Nov. 19, 2013.)

Page 2 - OPINION AND ORDER

1    Plaintiff was hired by Defendant effective May 2, 2011, to
2  work as a commercial truck driver. Defendant requires its drivers
3  to comply with applicable Department of Transportation ("DOT")
4  regulations.   Possessing a valid DOT medical certificate is a
5  prerequisite to being employed as one of Defendant's drivers.
6  Defendant's policies state that obtaining a DOT medical certificate
7  under false pretenses would be grounds for automatic termination.
8  (Kreider Decl. ¶ 11; Ohman Back Decl. Ex. B at 15.)
9  "[F]alsification of an application or any work, personnel, or other
10  J.B. Hunt records" would also be grounds for automatic termination.
11  (Kreider Decl. ¶ 11; Ohman Back Decl Ex. B at 15.)

12    Plaintiff understood that his position was contingent upon
13  successfully passing a DOT examination and possessing a valid DOT
14  medical certificate.   As part of the hiring process, Plaintiff
15  completed and signed a "Medical Examination Report For Commercial
16  Driver Fitness Determination."  (Ohman Back Decl. Ex. B at 2.)
17  Under the health history section, Plaintiff answered: (1) "no" to
18  having "any illness or injury in the last 5 years," (2) "no" to
19  prior "cardiovascular conditions," (3) "no" prior "heart surgery"
20  or any "surgery," and (4) "no" prior "loss of or altered
21  consciousness" or "fainting, dizziness."[2] (Ohman Back Decl. Ex. B
22  at 2.)  Plaintiff certified that he provided complete and accurate
23  information, and he acknowledged that "inaccurate, *false, or*
24  *missing* information may invalidate the [DOT] examination and [his]
25  Medical Examiner's Certificate."  (Ohman Back Decl. Ex. B at 2)
26  (emphasis added).

27
28    [2] The Court notes that only the first question on the Medical
   Examination Report was limited to a five-year time period.

Page 3 - OPINION AND ORDER

1   Plaintiff claims that he verbally informed Operations
2   Supervisor, Mario Nucci ("Nucci"), and the DOT medical examiner,
3   Stephanie Toman ("Toman"), M.D., about the 2005 incident, the 2006
4   incident and his May 2006 catheter ablation procedure.  (Ambrose
5   Dep. 54:19-55:6, 122:1-123:16, Jan. 25, 2013.)  Plaintiff does not
6   dispute, however, that he provided false information on the medical
7   history form used by the DOT to evaluate his fitness to work as a
8   commercial truck driver.  (Ambrose Dep. 51:6-15, 52:1-9, 67:16-21.)
9   Nor can Plaintiff dispute whether pertinent information regarding
10  his medical history was missing from the Medical Examination
11  Report.

12      On December 29, 2011, Plaintiff began to suffer from cold
13  symptoms while driving a semi-truck for Defendant from Portland,
14  Oregon, to Weed, California, and back.  After arriving in Weed at
15  approximately 4:45 p.m. on December 29, 2011 (Ambrose Tr. 4:10-25,
16  Dec. 30, 2011), Plaintiff took a dose of DayQuil to treat his chest
17  cold symptoms (Ambrose Dep. 142:3-14).  Plaintiff went to bed
18  around 8:00 p.m. that evening.  (Ambrose Tr. 17:21-25.)  Plaintiff
19  took another dose of DayQuil at approximately 3:00 a.m. on December
20  30, 2011 (Ambrose Tr. 17:5-10; Ambrose Dep. 142:16-17), and
21  departed for Portland about six minutes later (Ambrose Tr. 3:22-
22  4:1).

23      At approximately 6:00 a.m., thirty miles north of Grants Pass,
24  Oregon, Plaintiff began to cough incessantly after extinguishing a
25  cigarette and blacked out behind the wheel.  (Ambrose Tr. 10:1-
26  11:24; Ambrose Dep. 150:13-151:5.)  The semi-truck careened across
27  the median and several oncoming traffic lanes, through a guardrail,
28  overturned on an embankment, and eventually came to rest underneath

Page 4 - OPINION AND ORDER

an overpass after narrowly missing the concrete support column. (Burgess Decl. Ex. 6 at 2; Ambrose Dep. 151:6-20, 152:11-153:7.) When Plaintiff regained consciousness, he was hanging upside down by his seat belt and needed assistance from a good Samaritan to get out of the cab. (Ambrose Dep. 151:22-152:1, 154:3-4.) Miraculously, no other vehicles were involved in the accident. (Ambrose Dep. 153:21-25; Burgess Decl. Ex. 6 at 3.)

Plaintiff immediately reported the accident to his direct supervisor, Account Manager Brad Kreider ("Kreider"), and then went by ambulance to the Three Rivers Community Hospital in Grants Pass, where he received treatment for a chest contusion (bruised chest) and fainting episode (syncope). The treatment notes prepared by the emergency room doctor, Douglas Howard ("Howard"), M.D., on the morning of the accident state:

> The patient appears uninjured other than some seat belt tenderness. It is not clear why he had a syncopal episode. I do not believe that simple coughing should cause syncope. *My query would be recurrence of his dysrythmia.* He has remained stable here. His plan is to return to Salem. *I have advised him absolutely no driving until he is further cleared by Cardiology.* He declines offer of analgesia, [so] all we will give is Tylenol and/or Ibuprofen for discomfort. He will follow up with Cardiology and his own physician when he returns to Salem.

(Ohman Back Decl. Ex. B at 22) (emphasis added).

Plaintiff was sitting on an emergency room bed when he was approached by Defendant's casualty investigator, David LaLande ("LaLande"). (Burgess Decl. Ex. 6 at 1-2.) Defendant had asked LaLande to obtain photographs of the accident scene and a recorded

statement from Plaintiff.[3] (Burgess Decl. Ex. 6 at 1.) Plaintiff consented to have his statement tape-recorded by LaLande and certified that "the statements [he] made [we]re true to the best of [his] knowledge." (Ambrose Tr. 20:22-21:1.) During the interview with LaLande, Plaintiff discussed his medical history, including a number of heart-related issues, in great detail. Also of note is that Plaintiff corrected himself after initially stating he had taken NyQuil, as opposed to DayQuil, at 3:00 a.m. that morning.[4] (Ambrose Tr. 17:5-10.)

While at the hospital, an unnamed representative of Defendant asked LaLande to transport Plaintiff "to Asante Occupational Health Clinic for a blood test once he was discharged from the hospital." (Burgess Decl. Ex. 6 at 2.) LaLande escorted Plaintiff to the clinic at approximately 12:29 p.m. (Burgess Decl. Ex. 6 at 2, Ex. 9 at 1) and then returned to the scene of the accident, roughly thirty miles north of Grants Pass, to photograph the interior of the cab and look for any contraband, medications or alcohol (Burgess Decl. Ex. 6 at 2, Ex. 9 at 1). At 12:36 p.m., while at the clinic, Plaintiff notified Defendant's safety department that he needed to be cleared by a cardiologist before he could operate

---

[3] LaLande received the assignment from Defendant at 6:30 a.m. (Burgess Decl. Ex. 6 at 1.) When he arrived at the accident scene, however, Plaintiff had already been transported to the hospital and LaLande was unable to obtain the necessary photographs due to low-light conditions and the fact that the semi-truck needed to be pulled upright. (Burgess Decl. Ex. 6 at 1.)

[4] Dr. Howard's emergency room record appears to be the only other place where a pre-termination reference to NyQuil can be found. (Ohman Back Decl. Ex. B at 21.) And the record does not indicate that Plaintiff made such a statement to one of Defendant's employees prior to being terminated.

Page 6 - OPINION AND ORDER

a vehicle.   (Burgess Decl. Ex. 9 at 1.)   At 1:03 p.m., Plaintiff notified Defendant's safety department that he completed the blood test.   (Burgess Decl. Ex. 9 at 1.)   At 1:29 p.m., LaLande completed his review and photographs of the accident scene.[5]   (Burgess Decl. Ex. 9 at 1.)

That same day, presumably around the same time, Kreider began filling out a Safety Event Review.   The true and correct copy of the three-page Safety Event Review is attached as Exhibit E to defense counsel's declaration.   (Ohman Back Decl. ¶ 6.)   When Kreider was deposed on May 7, 2013, he initially claimed that the entire Safety Event Review was drafted during a telephonic meeting held on January 4, 2012, even though the review date is listed as December 30, 2011.   (Kreider Dep. 22:1-11, 34:12-35:3, May 7, 2013.)   After taking a nine-minute break, Kreider asked to correct himself and proceeded to explain that he initiated the Safety Event Review on the day of the accident by typing in "the alpha code" and that "it was a collision," but he "didn't actually input any of the facts and information in there until . . . the [telephonic meeting on January 4, 2012]."   (Kreider Dep. 41:15-22, 42:15-24.)   On September 2, 2013, Kreider submitted a declaration to the Court indicating that he prepared the Safety Event Review "at or near the time of [the] Safety Event Review Meeting."   (Kreider Decl. ¶ 7.)   Kreider's testimony on this matter should be evaluated by a jury.

---

[5] The Court notes that the safety department records from the day of the accident reference that LaLande (the adjuster or ADJ) "called in," but the only callers that appear to be listed are Plaintiff (the driver or "V1") and Kreider (the account manager or "A/M").   (Burgess Decl. Ex. 9 at 1.)

1    Under the section entitled "Conclusion of Review," the Safety
2    Event Review states, among other things: (1) the safety department
3    "is setting up a drug screen," (2) the "root cause" of the accident
4    was improper rest and improper recognition of illness, (3)
5    Plaintiff should "[a]lways report illness to management and never
6    operate a truck with inadequate rest, breaks, or proper health,"
7    and (4) "[a]ny future safety events could lead to disciplinary
8    actions up to and including termination of employment." (Ohman
9    Back Decl. Ex. E at 1.) The second page of the Safety Event
10   Review, however, indicates that Plaintiff had been terminated and
11   that Kreider's electronic signature was affixed on January 4, 2012.
12   (Ohman Back Decl. Ex. E at 2.)

13    In the afternoon or evening of December 30, LaLande submitted
14   his investigative report to Defendant. The report is addressed to
15   Defendant and dated December 30, 2011, the specified "loss date."
16   (Burgess Decl. Ex. 6 at 1.) The report clearly states that LaLande
17   enclosed a copy of Plaintiff's recorded statement (detailing his
18   medical history and mistaken reference to NyQuil), a self-described
19   "complete summary" of Plaintiff's statement, and the Oregon State
20   Police Crash report. (Burgess Decl. Ex. 6 at 1-2.)

21    Four days later, on January 3, 2012, Kreider called Plaintiff
22   to let him know that a Safety Event Review would be conducted.
23   (Ambrose Dep. 202:17-203:4.) Plaintiff informed Kreider that he
24   would not be able to attend in person since he was not cleared to
25   operate a vehicle. (Ambrose Dep. 203:6-9; *see also* Kreider Decl.
26   ¶ 7.)

27    Plaintiff attended a telephonic Safety Event Review on January
28   4, 2012, before Kreider, Area Risk Manager Keith Phillips

Page 8 - OPINION AND ORDER

("Phillips"), and General Manager of Delivery Services Mike Nicholson ("Nicholson") (collectively, "the safety review team"). (Nicholson Decl. ¶ 2; Phillips Decl. ¶ 2; Kreider Decl. ¶ 7.) During that teleconference, Kreider prepared a portion of the "Conclusion of Review" section based on Plaintiff's description of the accident *and* the Oregon State Police Crash Report. (Kreider Decl. ¶ 8; Kreider Dep. 22:1-11, 42:16-24.)  When Plaintiff mentioned that he had taken DayQuil, Kreider asked for and received a picture message of the bottle because he "wanted to make sure that what [Plaintiff] was saying was accurate, that he was [actually] taking DayQuil" (Kreider 24:12-22), as opposed to, for example, NyQuil (Kreider Dep. 24:23-25:1).

By this time, Kreider and Nicholson both knew that "the physicians at the hospital wanted [Plaintiff] to be checked out again before he could drive." (Nicholson Decl. ¶ 2; Kreider Decl. ¶ 7.)  Nevertheless, the safety review team apparently all agreed that improper rest and improper recognition of illness was the root cause of the accident (Kreider Decl. ¶ 7; Phillips Decl. ¶ 2), and that the accident was therefore preventable (Kreider Decl. ¶ 7; Phillips Decl. ¶ 2; Nicholson Decl. ¶ 3).  Later that day, a Driver Status Change was prepared indicating that Plaintiff had been terminated for violating DOT regulations.[6]  (Burgess Decl. Ex. 7 at 4-5.)

---

[6] *See* 49 C.F.R. § 392.3 (prohibiting drivers from operating commercial motor vehicles "while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle.")

Page 9 - OPINION AND ORDER

1      Prior to being informed of his termination, Plaintiff claims

2 that he "orally requested that he be returned to work upon his

3 doctor's release, and that if possible he be employed in some other

4 work in the interim." (Second Am. Compl. ¶ 15; Ambrose Decl. ¶

5 10.)   On January 5, 2012, Plaintiff called Kreider to report an

6 upcoming appointment with a cardiologist and was told that he had

7 been fired.  (Ambrose Dep. 215:1-22.)  Sometime in April of 2012,

8 Plaintiff was diagnosed with a heart condition necessitating a

9 pacemaker.  It was not until about the third week of April 2012

10 that Plaintiff was able to return to work as a commercial truck

11 driver.  Plaintiff continued to suffer from severe heart-related

12 problems and had a stent implanted on May 16, 2012.

13      In early September 2012, Plaintiff commenced the present

14 action against Defendant in Multnomah County Circuit Court,

15 alleging state law claims for violation of the OFLA, disability

16 discrimination, failure to engage in interactive process and

17 wrongful discharge, along with a federal claim for violation of the

18 Family and Medical Leave Act ("FMLA").  On September 26, 2012,

19 Defendant removed the action to federal court on the basis of

20 diversity and federal question jurisdiction.  28 U.S.C. §§ 1331,

21 1332.  Following the grant of an unopposed motion for leave

22 pursuant to Rule 15(a)(2), Plaintiff filed an amended complaint on

23 October 18, 2012, alleging only state law claims for violation of

24 OFLA, disability discrimination, failure to engage in interactive

25 process, and workers' compensation discrimination.

26                            **II. LEGAL STANDARD**

27     Summary judgment is appropriate "if pleadings, the discovery

28 and disclosure materials on file, and any affidavits show that

Page 10 - OPINION AND ORDER

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Summary judgment is not proper if factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

At the outset, it must be noted that, for purposes of the pending motion only, Defendant "relies upon Plaintiff's allegations and admissions to demonstrate that, even if true, no genuine issue of material fact exists to defeat summary judgment on all claims." (Def.'s Mem. Supp. at 2.) "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted).

Page 11 – OPINION AND ORDER

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of plaintiff's positions [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

### III. EVIDENTIARY RULINGS

**A.  Motion One**

At page eight of its memorandum in support, Defendant notes that its safety review team felt that "the December 30, 2011 *potentially deadly*, rollover accident was preventable." (Def.'s Mem. Supp. at 8) (emphasis added). Plaintiff moves to strike the emphasized language on the ground that it is irrelevant under Federal Rule of Evidence ("FRE") 401.

While the Court is mindful of the fact that "[d]efects in evidence submitted in opposition to a motion for summary judgment are waived absent a motion to strike or other objection," *FDIC v.*

Page 12 - OPINION AND ORDER

*N.H. Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991) (citing *Scharf v. U.S. Att'y Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979)), not all "objections are necessary, or even useful, given the nature of summary judgment motions in general," *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Indeed, "objecti[ng] to evidence on the ground that it is irrelevant . . . [is] duplicative of the summary judgment standard itself." *Id.* Courts "can award summary judgment only when there is no genuine dispute of *material* fact." *Id.*

The Court is capable of determining which facts are relevant to Defendant's motion for summary judgment and disregarding extraneous or improper factual statements. The adjectives Defendant chooses to use in describing the accident in this case are not facts, but are properly treated as argument. No part of the Court's decision on this motion is based on the language objected to and therefore this motion is denied as moot.

**B.    Motion Two**

At page fourteen and fifteen of its memorandum in support, Defendant states: "*In a transparent attempt* to avoid the consequences of [Defendant's] after-acquired evidence and create a material issue of fact, Plaintiff subsequently testified he told his . . . supervisor, Mario Nucci, and the [DOT] Medical Examiner that he had a catheter ablation in 2006 on or about April 27, 2011." (Def.'s Mem. Supp. at 14-15) (emphasis added). Here, Defendant is alluding to its assertion that, prior to being hired, Plaintiff made material misrepresentations to Defendant and the DOT medical examiner about his past medical history. Plaintiff moves

to strike the emphasized language on the ground it is "inappropriate" and irrelevant under FRE 401.

The Court denies Plaintiff's motion to strike Defendant's counsel's use of the language "[i]n a transparent attempt," because it is not a factual statement. It is permissible legal argument, although not helpful.

## C.    Motion Three

At page three of its memorandum in support, Defendant references that "*Plaintiff never advised . . . the DOT* medical examiner, or J.B. Hunt, that he had lost consciousness while driving before he was hired or before the December 30, 2011 accident—and, in fact, now denies he ever lost consciousness before this accident despite his unambiguous admissions to the contrary." (Def.'s Mem. Supp. at 3.) Plaintiff moves to strike the emphasized language on the grounds that it is inaccurate and that Defendant lacks personal knowledge of that which it declares.

Whether Defendant's statement in its argument is correct or not that Plaintiff has provided inconsistent reports and testimony on the subject of whether he had lost consciousness while driving prior to December 30, 2011, is not a basis to strike the argument. The motion is denied.

## D.    Motion Four

At page four of its memorandum in support, Defendant states that:

> Plaintiff also reported his health history on the [DOT] Medical Examination Report. Again Plaintiff answered 'no' to having 'any illness or injury in the last 5 years,' 'no' prior 'heart surgery' or any 'surgery,' and 'no' prior 'loss of or altered consciousness' or 'fainting, dizziness.' Plaintiff certified that he provided 'complete and true' information. He

Page 14 – OPINION AND ORDER

acknowledged that 'inaccurate, false, or missing information may invalidate the examination and [his DOT] Medical Examiner's Certificate.' *Plaintiff denied all other prior medical history to the DOT medical examiner.*

(Def.'s Mem. Supp. at 4) (internal citations omitted) (emphasis added). Plaintiff moves to strike the emphasized language on the ground that the DOT medical examiner, Toman, "does not have any recollection concerning Plaintiff's DOT medical examination [and thus] cannot give testimony concerning matters about which she has no personal knowledge." (Pl.'s Resp. at 7-8.)

Again, this is defense counsel's argument of what the record evidence means. It is not an effort by counsel to "supplement" the record. Therefore, the motion is denied.

Of interest, having denied the motion, the Court notes that Toman concedes that she cannot specifically recall Plaintiff or his examination. (Toman Dep. 27:18-28:7, July 15, 2013.) Toman did, however, provide the following testimony regarding the notes she transcribed on Plaintiff's report during his examination:

Q. Okay. And what do your notes say [on Plaintiff's DOT Medical Examination Report]?

A. It looks like a little bit of, maybe, the date there is cut off, but I read (quoted): '18/2011, {left} heel injury - followed by podiatrist - no limitations,' and denies any other past medical history. Denies hospitalization. No medications.

Q. Okay. Does it say anything about a catheter ablation [Plaintiff underwent in May 2006]?

A. No.

Q. If he had told you that he'd had a catheter ablation, is that something you would have written down?

A. Yes.

Q. Now, Mr. Ambrose has testified that he told you he had a catheter ablation but had no subsequent issues, and

1    [that] you stated (quoted as read): 'All right.   Then
2    don't worry about it.' Do you recall any such
     conversation?

3    A. No.

4    Q. If you had that discussion, is that something you
5    would have made note of?

6    A. Absolutely.

     Q. And why is that?
7
8    A. Because that's significant past medical history for
     someone that is going to be driving [semi-trucks].

9    Q. Would you have made a note of it anywhere else in his
10   records, or would it have been under this section [on the
     medical examination report entitled 'Medical Examiner's
11   Comments on Health History']

12   A. It would have been under that . . . section . . . and
     sometimes, if I ran out of room [in that section], I
13   would have to write down the side [on the same page of
     the report].

14   (Toman Dep. 13:12-14:18.)

15        This is the record before the Court.

16   **E.    Motion Five**

17        At page eight of its memorandum in support, Defendant states:

18   "At the time of his December 30, 2011 accident, *Plaintiff did not*

19   *know he had a medical condition*, which he subsequently believed

20   caused the incident." (Def.'s Mem. Supp. at 8.)   Plaintiff moves

21   to strike the emphasized language on the ground that it is

22   inaccurate.   As Plaintiff goes on to explain, the passage of his

23   deposition testimony cited by Defendant does not support this

24   assertion because Plaintiff "testified he had been informed he had

25   a heart attack by the ER physician." (Pl.'s Resp. at 8.)

26        Pure common sense and simple logic demonstrates Plaintiff's

27   motion to strike lacks merit.   Plaintiff did not visit the

28   emergency room until after his December 30, 2011 accident.

Page 16 - OPINION AND ORDER

Defendant prefaced its statement regarding Plaintiff being unaware of a medical condition by stating "[a]t the time of his December 30, 2011 accident." If Plaintiff received information regarding a potential medical condition after the accident occurred, Defendant's counsel's statement is accurate. Plaintiff's counsel ignores Plaintiff's testimony that he "had a medical condition unknown to [him] at the time that caused [the December 30, 2011] accident." (Ambrose Dep. 245:21-22.) Motion denied.

**F.   Motion Six**

At page eight of its memorandum in support, Defendant states:

> At the time of his termination [on January 5, 2012], Plaintiff had not been released to drive by a physician.
>
> While disputed, Plaintiff alleges that Mr. Kreider advised him that J.B. Hunt did not have any work for him, but once he was cleared to drive to let them know 'to see if . . . we could get reviewed and possibly rehired.' *Plaintiff could not perform the essential functions* of the driving position, with or without reasonable accommodation. Plaintiff, however, was not aware of any open, light duty (non-driving) positions at J.B. Hunt at the time of his termination.

(Def.'s Mem. Supp. at 8) (emphasis added). Plaintiff moves to strike the emphasized language on the ground that it is an "[i]nappropriate legal conclusion unsupported by the cited material." (Pl.'s Resp. at 8.)

Once again, Defendant's counsel is presenting an argument about whether the record raises a material issue of fact. Whether the record raises a question about Plaintiff's ability to perform the essential functions of the commercial truck driver position is addressed below in evaluating Plaintiff's disability discrimination claim. Motion denied.

///

Page 17 – OPINION AND ORDER

**G.    Motion Seven**

At page thirteen of its memorandum in support, Defendant states: "In sum, Plaintiff did not disclose *(1) the 1999 syncope*; (2) the 2006 catheter ablation . . . ; and (3) the 2009 syncope while driving to either J.B. Hunt or the DOT Medical Examiner prior to his employment." (Def.'s Mem. Supp. at 13) (emphasis added). Plaintiff moves to strike the emphasized language on the ground that "Defendant has offered no expert testimony as foundation for the assertion that any prior incident was a 'syncope.'" (Pl.'s Resp. at 8.)

Whether Defendant correctly characterizes the 1999 event (or any other alleged syncopal event, for that matter) moved against, or not, is not a question the Court must resolve on this summary judgment motion. As with many of the motions to strike, this is argument of counsel not factual evidence. Therefore the motion to strike is denied.

## IV. DISCUSSION

**A.    OFLA Interference**

Defendant argues that it is entitled to summary judgment on Plaintiff's OFLA interference claim on two grounds. First, Defendant contends that "Plaintiff could not have returned to work within twelve weeks after the incident and, therefore, OFLA would not protect Plaintiff as a matter of law." (Def.'s Mem. Supp. at 16.) Second, Defendant contends that "Plaintiff never qualified for OFLA because, prior to his termination, he did not establish that he suffered from a 'serious health condition.'" (Def.'s Mem. Supp. at 16.)

To the extent possible, OFLA is to be construed in a manner that is consistent with any similar provisions of the FMLA.  OR. REV. STAT. § 659A.186(2).  "Consistent with this legislative declared intent, the Oregon courts have looked to federal law when interpreting OFLA." *Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2011).  "FMLA and OFLA allow eligible employees to take twelve workweeks of leave per year to care for their own or a family member's serious health condition," *Lawson v. Walgreen Co.*, No. CV. 07-1884-AC, 2009 WL 742680, at *5 (D. Or. Mar. 20, 2009), and "[e]mployers are not allowed to deny or in any way interfere with an employee's right to take leave under either FMLA or OFLA," *id.*

Under his first cause of action**,** Plaintiff alleges that "Defendant interfered with his OFLA rights by terminating him before he was able to exercise such rights, and discharged [him] because he took medical leave." (Second Am. Compl. ¶ 18.) Plaintiff's first cause of action, as plead, is appropriately considered an interference claim. *See* 29 U.S.C. § 2615(a)(1). Indeed, as the Ninth Circuit explained in *Bachelder v. American West Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001): "By their plain meaning, the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave.  Such action is, instead, covered under § 2615(a)(1), the provision governing '[i]nterference [with the] [e]xercise of rights.'"  *Id.* at 1124 (citations omitted); *Hall-Hood v. Target Corp.*, No. 2:12-cv-01458-APG, 2013 WL 3030477, at *3 (D. Nev. June 14, 2013) (citing *Bachelder* for the same proposition).

Page 19 - OPINION AND ORDER

1    Defendant's memorandum in support and Plaintiff's opposition
2    brief correctly address Plaintiff's first cause of action as an
3    interference claim brought pursuant to § 2615(a)(1).  At page eight
4    of its reply brief, however, Defendant characterized Plaintiff's
5    allegation that Defendant "discharged [him] because he took medical
6    leave" as a retaliation claim brought pursuant to § 2615(a)(2). *See*
7    *Sanders*, 657 F.3d at 777 ("An allegation of a violation of [§
8    2615(a)(2)] is known as a 'discrimination' or 'retaliation'
9    claim.")  That is incorrect.
10    Some circuits have invoked § 2615(a)(2) in cases where the
11    employee "was subjected to an adverse employment action for taking
12    FMLA protected leave." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133
13    n.7 (9th Cir. 2003).  The Ninth Circuit, however, has "clearly
14    determined that § 2615(a)(2) applies only to employees who *oppose*
15    employer practices made unlawful by FMLA, whereas, § 2615(a)(1)
16    applies to employees who simply take FMLA leave and as a
17    consequence are subjected to unlawful actions by the employer."
18    *Id.; see also Flores v. Merced Irrigation Dist.*, 758 F. Supp. 2d
19    986, 996 (E.D. Cal. 2010) (discharge constitutes an unlawful or
20    adverse employment action under the FMLA).
21    Clarifying the appropriate characterization of Plaintiff's
22    first cause of action is critical for two reasons.  The first is
23    that the Ninth Circuit does not apply the burden-shifting framework
24    delineated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792
25    (1973), to interference claims. *Sanders*, 657 F.3d at 778. Instead,
26    an employee can prove an interference "claim, as one might any
27    ordinary statutory claim, by using either direct or circumstantial
28    evidence, or both." *Bachelder*, 259 F.3d at 1125.  The second is

Page 20 - OPINION AND ORDER

that "the employer's intent is irrelevant to a determination of liability" in an interference case. *Sanders*, 657 F.3d at 778. Therefore, in evaluating the motion against the OFLA interference claim, the Court will not consider the motive of Defendant nor apply the *McDonnell Douglas* burden-shifting framework.

Because Oregon applies case law interpreting FMLA to OFLA claims, the discussion below is of FMLA case law. The elements of a prima facie OFLA interference claim are: (1) the employee was eligible for OFLA's protections, (2) the employer was covered by the OFLA, (3) the employee was entitled to leave under the OFLA, (4) the employee provided sufficient notice of her intent to take leave, and (5) the employer denied the employee OFLA benefits to which she was entitled. *See Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1080 (D. Or. 2012); *see also Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).

The Court begins by addressing Plaintiff's claim that "Defendant admits [that] it failed to inform [him] of the availability of OFLA leave." (Pl.'s Resp. at 13.) "[T]he employer is responsible, having been notified of the reason for an employee's absence [or having been notified that leave is needed], for being aware that the absence may qualify for FMLA protection." *Bachelder*, 259 F.3d at 1131; 29 C.F.R. § 825.302(c) (employees only need to "state that leave is needed.") Once such notice is given, "[i]t is the employer's responsibility to determine when FMLA [or in this case OFLA] leave is appropriate, to inquire as to specific facts to make that determination, and to inform the employee of his or her entitlements." *Amway Corp.*, 347 F.3d at 1134.

Page 21 - OPINION AND ORDER

1    The record does suggest that Defendant received notice that a
2    potential FMLA-qualifying absence was forthcoming.  Specifically,
3    on December 30, 2011, at 12:36 p.m., Defendant's safety department
4    received a call from Plaintiff, indicating that he had to see a
5    cardiologist before the emergency room doctor would clear him to
6    drive.  (Burgess Decl. Ex. 9 at 1.)    That call to the safety
7    department raises a material issue of fact as to whether Defendant
8    was on notice that Plaintiff was in need of FMLA/ OFLA leave.  *Cf.*
9    *Cooper    v.    Gulfcoast    Jewish    Family    Servs.,    Inc.*,    No.
10   8:09-cv-787-T-30TBM, 2010 WL 2136505, at *7 (M.D. Fla. May 27,
11   2010)  (denying  motion  for  summary  judgment  on  employee's
12   interference claim because an "e-mail from [the employee] stating
13   that her physician had referred her for further treatment and
14   additional information would be forthcoming, create[d] a material
15   disputed fact as to whether [the employer] was on notice that
16   Plaintiff was requesting additional FMLA leave.")

17       The  problem  for  Plaintiff  is  that  "'an  actionable
18   'interference' in violation of § 2615(a)' exists [only] when the
19   plaintiff  'is  able  to  show  prejudice  as  a  result  of  that
20   violation.'"  *Stewart v. Sears, Roebuck & Co.*, No. CV-04-428-HU,
21   2005 WL 545359, at *11 (D. Or. Mar. 7, 2005) (citation omitted).
22   Guided by that principle, judges from this district have disposed
23   of interference claims at the summary judgment stage when, for
24   example, the employee indisputably could not return to work within
25   twelve weeks of being discharged.  *See Santrizos v. Evergreen Fed.*
26   *Sav. & Loan Ass'n*, Civ. No. 06-886-PA, 2007 WL 3544211, at *5-6 (D.
27   Or. Nov. 14, 2007) (employee suffered no harm since he could not
28   return to work within twelve weeks of the effective termination
Page 22 - OPINION AND ORDER

date); *Nelson v. Unified Grocers, Inc.*, No. 3:10-cv-00531-PK, 2012 WL 113742, at *1 (D. Or. Jan. 12, 2012) (Mosman, J.) (reversing recommendation to deny summary judgment on § 2615(a)(1) claims, stating, among other things, that "even assuming [the] discharge was retaliatory, there is no material dispute that [the employee] was unable to work for at least several months post-discharge.")

*Santrizos* and *Nelson* are consistent with the understanding that the right to reinstatement "is the linchpin of the [interference] theory [since] 'the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation that an employee will return to work after the leave ends.'" *Sanders*, 657 F.3d at 778 (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). They are also consistent with the understanding that § 2615(a)(1) "is not a strict liability statute." *Grimes v. Fox & Hound Rest. Group,* No. 12-CV-1229-JAR, 2013 WL 6179292, at *10 (D. Kan. Nov. 25, 2013); *see also Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 979-80 (8th Cir. 2005) ("Logic also dictates we interpret the FMLA to preclude the imposition of strict liability whenever an employer interferes with an employee's right to take FMLA leave"); *Edgar*, 443 F.3d at 508 ("By the same token, the FMLA is not a strict-liability statute.")

Without giving due consideration to the declared legislative intent of the OFLA and the Oregon appellate court decisions that have looked to federal law when interpreting the OFLA, *see, e.g., Yeager v. Providence Health Sys. Or.*, 195 Or. App. 134, 140 (2004), Plaintiff attempts to avoid the *Santrizos* line of cases by arguing that "they are federal cases interpreting FMLA rather than OFLA and

Page 23 - OPINION AND ORDER

1  thus are not controlling precedent." (Pl.'s Resp. at 13.) The
2  Court is not persuaded by this argument and will look to federal
3  law when interpreting the OFLA.

4      The Court is similarly unpersuaded by Plaintiff's argument
5  that, "under Defendant's handbook, [he] was entitled to six weeks
6  of personal leave, placing [his] release date (the third week in
7  April) within the time permitted for [statutory] leave." (Pl.'s
8  Resp. at 14.) Plaintiff cites no authority in support of this
9  aggregation theory, and in the Court's view, such a theory has no
10 place in the interference context.

11     Employers are not liable under an interference theory if they
12 "discharge a person who fails to return to work at the expiration
13 of the twelve week period, even if [the employee] cannot return to
14 work for medical reasons." *Kleinmark v. St. Catherine's Care Ctr.*,
15 585 F. Supp. 2d 961, 963 (N.D. Ohio 2008). That is so regardless
16 of whether the medical evidence revealing the employee's inability
17 to return to work was discovered post-discharge, *Edgar*, 443 F.3d at
18 513, or even pertained to the same physical or mental condition
19 "that forced the employee to take a medical leave in the first
20 place," *id*. at 516, and regardless of whether the employee's
21 ability to return twelve weeks after being discharged was due to a
22 condition exacerbated by the decision to terminate, *Santrizos*, 2007
23 WL 3544211, at *7-8. The case law simply does not suggest, as
24 Plaintiff posits, that employees can use personal leave to extend
25 the twelve-week statutory leave period in order to revive an
26 expired right to reinstatement and impose liability on their
27 employer under the FMLA. Were that not the case, the twelve-week
28 statutory leave period would become a sword, rather than a shield.

Page 24 - OPINION AND ORDER

1    Defendant terminated Plaintiff's employment effective January
2    5, 2012.  During his deposition, Plaintiff testified that he was
3    not cleared to "drive a truck" until "about the third week of
4    April" 2012, which would have been between 100 and 107 days after
5    he was discharged.  (Ambrose Dep. 243:19-244:9; 254:8-12.)
6    Plaintiff has also made the following statement: "I was unable to
7    work driving a vehicle until I had a pacemaker implanted and a
8    right coronary st[e]nt [implanted on May 16, 2012]."  (Ambrose
9    Decl. ¶ 7; Ambrose Dep. 279:8-24; Pl.'s Resp. at 17.)  Clearly
10   Plaintiff was not capable of resuming his duties as a commercial
11   truck driver within the FMLA-leave period of eighty-four days.  *See*
12   *generally Edgar*, 443 F.3d at 512 ("[T]he court is charged with
13   resolving the objective question of whether the employee was
14   capable of resuming his or her duties within the FMLA-leave
15   period.")  Defendant is therefore entitled to summary judgment on
16   Plaintiff's interference claim.

17   **B.    Disability Discrimination**

18        Defendant argues that it is entitled to summary judgment on
19   Plaintiff's disability discrimination claim because Plaintiff has
20   failed to show that: (1) he was a "qualified individual" with a
21   disability; (2) he suffered an adverse employment action because of
22   his disability; and (3) Defendant's legitimate, nondiscriminatory
23   reason for terminating his employment was mere pretext for
24   disability discrimination.[7]

25

26        [7] Under his second cause of action, Plaintiff alleges that
     Defendant violated Oregon's disability discrimination statute, ORS
27   659A.112, when it "terminated [him] in substantial part either
     because of [his heart condition], or in the alternative, because
28   Defendant perceived Plaintiff as being disabled."  (Second Am.

Page 25 - OPINION AND ORDER

1   Oregon's disability discrimination statute "makes it an
2   unlawful employment practice for an employer to refuse to hire or
3   promote, to bar or discharge from employment, or to discriminate in
4   the terms, conditions, or privileges of employment on the basis of
5   an otherwise qualified person's disability." *Mayo v. PCC*
6   *Structurals, Inc.*, No. 3:12-CV-00145-KI, 2013 WL 3333055, at *3 (D.
7   Or. July 1, 2013) (citing ORS 659A.112(1)).  The statute specifies
8   that an employer discriminates by, *inter alia*, not making
9   "reasonable accommodation to the known physical or mental
10  limitations of a qualified individual with a disability who is
11  a[n] . . . employee, unless the employer can demonstrate that the
12  accommodation would impose an undue hardship on the operation of
13  the business of the employee." OR. REV. STAT. § 659A.112(2)(e).

14      **1.   The Prima Facie Case**

15      Consistent with the legislative declared intent, ORS 659A.112
16  is to be construed to the extent possible in a manner that is
17  consistent with any similar provisions in the Americans with
18  Disabilities Act of 1990 ("ADA"). *See* OR. REV. STAT. § 659A.139. In
19  order to establish a prima facie case of disability discrimination
20  under the ADA, "a plaintiff must show that he: (1) is a disabled or
21  perceived as such; (2) is a qualified individual, meaning he is
22  capable of performing the essential functions of the job; and (3)

23
24
25
26  ─────────────────
27  Compl. ¶ 23.)  Plaintiff also alleges that Defendant discriminated
    against him in violation of ORS 659A.112 by failing to "attempt to
    accommodate [his] known disability." (Second Am. Compl. ¶¶ 15,
28  20.)

Page 26 - OPINION AND ORDER

suffered an adverse employment action because of his disability."[8]
*Shepard v. City of Portland*, 829 F. Supp. 2d 940, 963 (D. Or.
2011); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087
(9th Cir. 2001) ("The standard for establishing a prima facie case
of discrimination under Oregon law is identical to that used in
federal law.")

### a.  Prong One: Disability

    The first prong requires the plaintiff to demonstrate that he
is disabled within the meaning of the ADA.  The ADA defines
"disability" as:  "(A) a physical or mental impairment that
substantially limits one or more of the major life activities of
such individual; (B) a record of such an impairment; or (C) being
regarded as having such an impairment."  42 U.S.C. § 12102(1).  As
should be clear from that definition, to establish a "regarded as"
claim under the ADA, "the plaintiff must present evidence that the
defendant [perceived him] as having a physical or mental impairment

---

[8]    Plaintiff's second cause of action is entitled
"disability/perceived disability discrimination," yet he presents
arguments in support of claims for retaliation and simple failure
to accommodate.  In addition to failing to plead such claims,
Plaintiff fails to recognize that they are distinct causes of
action.  *See Carvajal v. Pride Indus., Inc.*, No. 10-cv-2319-GPC,
2013 WL 1728273, at *6 (S.D. Cal. Apr. 22, 2013) (discrimination
distinct from a cause of action for retaliation under the ADA);
*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001)
("Unlike a simple failure to accommodate claim, an unlawful
discharge claim requires a showing that the employer terminated the
employee because of his disability.")   The Court declines to
consider any simple failure to accommodate claim or retaliation
claim at this stage in the proceedings. *See Wasco Prods. v.
Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006)
("[S]ummary judgment is not a procedural second chance to flesh out
inadequate pleadings"); *Speer v. Rand McNally & Co.*, 123 F.3d 658,
665 (7th Cir. 1997) ("A plaintiff may not amend his complaint
through arguments in his brief in opposition to a motion for
summary judgment.")

Page 27 - OPINION AND ORDER

that substantially limits a major life activity." *Echols v. Lokan & Assocs., Inc.*, No. CV-06-293-ST, 2007 WL 756691, at *10 (D. Or. Mar. 7, 2007); *see also Kellogg v. Union Pac. R.R. Co.*, 233 F.3d 1083, 1089 (8th Cir. 2000) ("To establish a 'regarded as' claim under the ADA, [plaintiff] must show that [defendant] perceived him as actually disabled.")

Plaintiff proceeds under alternative theories with respect to the first prong of the prima facie case, namely that he is disabled "by virtue of his heart condition," or alternatively, that "Defendant perceived [him] as being disabled" based on the December 30, 2011 accident.[9]  (Second Am. Compl. ¶¶ 21-23.)  Although Defendant disputes whether it had any knowledge or perception that Plaintiff was disabled, "for the purposes of this motion only, [Defendant] assumes Plaintiff may have had an actual disability at the time of his January 5, 2012 termination." (Def.'s Mem. Supp. at 21.)  Because the ADA defines disability in the disjunctive, Defendant's concession is sufficient to create a genuine issue of material fact as to the first prong of Plaintiff's prima facie case of discrimination. *See Walsh v. Bank of Am.*, 320 F. App'x 131, 132-33 (3d Cir. 2009) ("Because the ADA lists the three subcategories in the disjunctive, a plaintiff must only show that he is disabled under one of the three subparts to establish the first element of a prima facie disability discrimination case.")

---

[9] That Court notes that, in order prove a record of disability under § 12102(1)(B) of the ADA, the documentary record must indicate that the plaintiff is "actually disabled" under § 12102(1)(A); that is, he has an impairment that substantially limits one or more of his major life activities. *Miller v. Winco Holdings, Inc.*, No. CV 04-476-S-MHW, 2006 WL 1471263, at *6 n.4 (D. Idaho May 22, 2006).

### b.   Prong Two: Qualified Individual

In addition to showing that he is disabled under ADA, Plaintiff must also show that he is a "qualified individual." *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (plaintiff bears burden of demonstrating that he is a qualified individual). A "qualified individual" is an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). Despite Plaintiff's suggestion to the contrary, summary judgment is appropriate if no reasonable trier of fact could conclude that he is a "qualified individual." *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1230 n.4 (9th Cir. 2003); *see also Kellogg*, 233 F.3d at 1086 (failure to establish any element of a prima facie ADA case warrants summary judgment).

Determining whether Plaintiff is a "qualified individual" requires the Court to consider whether Plaintiff was able to perform the essential functions of the commercial truck driver position at the time of his termination *without* accommodation, and then, if he cannot, whether he was able to do so *with* reasonable accommodation. *See Dark v. Curry County*, 451 F.3d 1078, 1086 (9th Cir. 2006), *cert. denied*, 549 U.S. 1205 (2007); *see also Kaplan*, 323 F.3d at 1231.    If Plaintiff cannot perform the commercial truck driver position's essential functions even with a reasonable accommodation, then the ADA's employment protections do not apply. *Cripe v. City of San Jose*, 261 F.3d 877, 884-85 (9th Cir. 2001).

The Court first addresses whether Plaintiff could perform the essential job functions of the commercial truck driver position *without* accommodation.  Plaintiff argues that he is a "qualified

Page 29 - OPINION AND ORDER

individual" because he "performed the essential functions of a driver, i.e., driving truck, before and after the accident." (Pl.'s Resp. at 19.)  Plaintiff's argument misses the mark.  The question is whether Plaintiff could operate a vehicle at the time of his termination.    An  illustrative  example  is  the  Ninth  Circuit's decision in *Curry County*.

In *Curry County*, the plaintiff did not dispute whether the operation of heavy machinery was an essential function of the position, choosing instead to dispute whether he was qualified to perform such function.  *Curry County*, 451 F.3d at 1087.  The Ninth Circuit concluded that there was no genuine issue of fact with respect to the plaintiff's qualifications *without* reasonable accommodation, stating:

> Had [plaintiff]'s treating physicians opined that [he] was fit to operate heavy machinery at the time of his firing, this perhaps would have given rise to a genuine issue of material fact as to his qualifications *without reasonable accommodation*. But the physicians actually recommended [plaintiff]'s return to work following a period of observation during which he could adjust to the change in his medication. [Plaintiff] provides no evidence that his seizures were under control at the time of his termination.

*Id.* (internal citation omitted).

Because the undisputed facts in the record in this case indicate that Plaintiff was not cleared to operate a vehicle at time of his January 5 termination, no reasonable juror could conclude that he was able to perform the essential functions of the commercial truck driver position *without* accommodation.  That conclusion flows logically from Plaintiff's own statements and from evidence presented by Defendant on what would appear to be an otherwise obvious and undisputed fact (namely, the essential

Page 30 - OPINION AND ORDER

functions of the commercial truck driving position). *See generally Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) ("[A]n employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions.")

The next issue is whether Plaintiff was able to perform the essential functions of the position *with* reasonable accommodation. The Ninth Circuit's decision in *Kaplan* demonstrates that Defendant is entitled to summary judgment to the extent Plaintiff proceeds on a theory that Defendant regarded him as disabled. In *Kaplan*, there was no issue of fact as to whether the employee could perform the essential job functions without accommodation, as is the case here. *Kaplan*, 323 F.3d at 1230-31. The Ninth Circuit held that there is no duty to accommodate an employee in an "as regarded" case. *Id.* at 1233. To the extent Plaintiff is bringing a "regarded as" case, the Court grants Defendant's motion for summary judgment in accordance with *Kaplan*. The disability discrimination claim rises or falls on the actual disability theory.

The remaining question, then, is whether, under a theory of actual disability, Plaintiff was able to perform the essential functions of the position *with* reasonable accommodation. Generally speaking, "[w]here an employee suffers from an actual disability (i.e., an impairment that substantially limits a major life activity), the employer cannot terminate the employee on account of the disability without first making reasonable accommodations that would enable the employee to continue performing the essential functions of his job." *Weber v. Strippit, Inc.*, 186 F.3d 907, 916 (8th Cir. 1999). The ADA's definition of discrimination includes

Page 31 - OPINION AND ORDER

"not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).

Plaintiff bears the burden of demonstrating that he could perform the essential functions of the position *with* reasonable accommodation.  *See Kennedy, Inc.*, 90 F.3d at 1481.  Reasonable accommodations may include, for example, reassignment to a vacant position or an allowance of time for medical care or treatment. *Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1109-10 (10th Cir. 1999). But reasonableness is not a constant; rather, "what is reasonable in a particular situation may not be reasonable in a different situation——even if the situational differences are relatively slight." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999).  That is why courts "must evaluate [a plaintiff's] requests in light of the totality of h[is] circumstances." *Id.*; *see also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (assessing reasonableness of proposed accommodation "requires a fact-specific, individualized inquiry.")

When viewed in the light most favorable to him, the record indicates that Plaintiff requested accommodation through either (1) reassignment to a vacant position or (2) an allowance of time (*e.g.*, time created by the use of medical leave, unpaid leave, an aggregation of leave, or an extension of an existing leave period) for medical care or treatment.

Indeed, with respect to the first accommodation, Plaintiff alleges that he requested to "be employed in some other work in the

Page 32 - OPINION AND ORDER

interim." (Second Am. Compl. ¶ 15.) Plaintiff also claims that, prior to being terminated, he requested reasonable accommodation of "modified duties." (Ambrose Decl. ¶ 10.) Plaintiff's declaration together with his deposition testimony makes clear that he sought an available position that would not conflict with his driving restrictions. (Ambrose Dep. 219:19-23; Second Am. Compl. ¶ 14.) In other words, Plaintiff requested accommodation through reassignment to a vacant position.

With respect to the second accommodation, Plaintiff alleges that Defendant refused his request to "be returned to work upon his doctor's release." (Second Am. Compl. ¶ 15.) Plaintiff also claims that, prior to being terminated, he informed Defendant the he "needed to see a cardiologist regarding possible heart conditions before being cleared to drive" and "requested [the] reasonable accommodation of time off of work." (Ambrose Decl. ¶¶ 9-10.) Because Plaintiff claims that he didn't "know [exactly] what was wrong with [him]" or "what [his] medical condition was" at the time of his termination (Ambrose Dep. 246:9-23, 247:25-248:3), the Court construes Plaintiff's request for "time off work," or to "be returned to work upon his doctor's release," as a request for an allowance of time for medical care or treatment.

With respect to Plaintiff's request to be reassigned, an employee is a qualified individual under the ADA if he can "perform the essential functions of a reassignment position, with or without reasonable accommodation, even if [he] cannot perform the essential functions of the current position." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 892 (9th Cir. 2001); *see also* 42 U.S.C. § 12111(9) (noting that reasonable accommodation may include

Page 33 - OPINION AND ORDER

reassignment to a vacant position).  In order "[t]o survive summary judgment, Plaintiff must establish that he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment." *Taylor*, 196 F.3d at 1110.

Plaintiff identifies no such vacant jobs within Defendant's company.  Plaintiff presents no evidence whatsoever demonstrating that appropriate vacant positions were available or would have become available within a reasonable time period.  (Ambrose Dep. 276:7-14) ("[A]t or about the time you asked, do you have any facts that would lead you to believe that there were such openings at that time for light-duty positions?  A. I don't know enough about this company to make a comment. So -- Q. Okay.  A. -- no.")  The sole record for the Court to consider is Plaintiff's statement that he was not "offer[ed] any light duty work" and Kreider's statement that "[Defendant] did not have any vacant and suitable positions for which [Plaintiff] was qualified at any time after the December 30, 2011 accident."  (Kreider Decl. ¶ 10; Pl's Opp'n at 24.) Accordingly, there simply is no genuine issue of fact as to whether Plaintiff could have been accommodated through reassignment.

Plaintiff also argues that his impairment ultimately proved to be remediable and Defendant failed to reasonably accommodate him by refusing to provide an allowance of time for medical care and treatment.  "An allowance of time for medical care or treatment may constitute a reasonable accommodation."  *Taylor*, 196 F.3d at 1110 (citation omitted).  But "[a]n indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of her impairment."  *Id.; see*

Page 34 - OPINION AND ORDER

*also Wynes v. Kaiser Permanente Hosps.*, 936 F. Supp. 2d 1171, 1184 (E.D. Cal. 2013) ("[R]easonable accommodation is . . . that which presently, or in the immediate future, enables the employee to perform the essential functions of the [position] in question. . . . [R]easonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected." (quoting *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995))).

In *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167 (10th Cir. 1996), for example, the employee's duties required her to spend approximately six hours per day on the phone and at the keyboard. *Id.* at 1168. About fourteen months after being hired on January 6, 1993, the employee complained to her supervisor that she was experiencing pain in her hands and arms. *Id.* Over the course of the next three months, the employee was diagnosed with carpal tunnel syndrome; her treating physician issued restrictions providing that she was to take fifteen minutes off for each hour of repetitive, digital activity; the physician issued new restrictions on April 13, 1994, prohibiting typing and keyboard activity, thereby necessitating the performance of other tasks; and lastly, she was terminated on May 24, 1994. *Id.* Two months post-termination, in July of 1994, the employee underwent nerve decompression surgery, and she was ultimately released from her physician's care with no specific work restrictions in October of 1994 (*e.g.*, between 130 and 160 days after being discharged). *See id.*

On appeal, the employee in *Hudson* challenged the district court's conclusion, at the summary judgment stage, "that she failed

Page 35 - OPINION AND ORDER

to create a genuine issue of material fact concerning her status as a qualified individual under the ADA." *Id.* Because the employee conceded that she was unable to perform the essential functions of the position without accommodation, the *Hudson* court focused on the second part of the qualified individual analysis, namely "whether any reasonable accommodation by the employer would enable h[er] to perform [the essential] functions." *Id.* (citation omitted). The employee emphasized that "her impairment was clearly remediable and that [the employer] failed to reasonably accommodate her by refusing to provide unpaid leave while she sought necessary treatment." *Id.* at 1169. The Tenth Circuit rejected her argument and affirmed the judgment of the district court, stating:

> [A] reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation. In this case, however, plaintiff has failed to present any evidence of the expected duration of her impairment as of the date of her termination. The physicians' reports upon which plaintiff relies indicate only that permanent impairment was not anticipated at the time the reports were prepared. The forms provide no indication, however, of when plaintiff could expect to resume her regular duties at [the company]. Moreover, [plaintiff's doctor]'s notes through the date of her termination underscore the uncertainty of her prognosis. Under these circumstances, it makes no difference that [defendant] had the option of removing her from the payroll and paying the cost of her disability benefits. [Defendant] was not required to wait indefinitely for her recovery, whether it maintained her on its payroll or elected to pay the cost of her disability benefits. Accordingly, [plaintiff] has failed to present evidence from which a reasonable jury could find that the accommodation she urges, unpaid leave of indefinite duration, was reasonable.

*Id.; see also Larson v. United Natural Foods W. Inc.*, 518 F. App'x 589, 591 (9th Cir. 2013) ("for a requested accommodation to be reasonable, the plaintiff must present evidence of the impairment's

expected duration, and not the duration of the leave request"
(citing *Hudson*, 87 F.3d at 1169).

As the Tenth Circuit explained in *Cisneros v. Wilson*, 226 F.3d
1113 (10th Cir. 2000), *overruled on other grounds*, *Board of
Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001),
they have distinguished *Hudson* and a found a request for leave to
seek medical treatment constituted a reasonable accommodation,
where the employee "submitted evidence from his doctor [indicating]
that the expected duration of his treatment was four months and his
prognosis for recovery was 'good.'"    *Id.* at 1130 (citation
omitted).

The Eleventh Circuit's decision in *Wood v. Green*, 323 F.3d
1309 (11th Cir. 2003), *cert. denied*, 540 U.S. 982 (2003), is
similarly illustrative.  In that case, the jury returned a verdict
in favor of the employee on his ADA discrimination claim after an
eight-day trial. *Id*. at 1311-12.  Shortly thereafter, the district
court denied the employer's renewed motion for judgement as a
matter of law—which required the court to view the evidence in the
light most favorable to the employee—finding that the employee's
requested accommodation for a leave of absence was not indefinite
since he had demonstrated an ability to return to work within "a
month or two" of experiencing cluster headaches.  *Id.* at 1312.

On appeal, the Eleventh Circuit reversed the district court's
order denying the employer's motion for judgment as a matter of
law—applying the same standards as the district court—stating:

> While a leave of absence might be a reasonable
> accommodation in some cases, [plaintiff] was requesting
> an indefinite leave of absence. [Plaintiff] might return
> to work within a month or two, or he could be stricken
> with another cluster headache soon after his return and

> require another indefinite leave of absence. [Plaintiff]
> was not requesting an accommodation that allowed him to
> continue work in the present, but rather, in the
> future—at some indefinite time. . . . [Our prior case
> law demonstrates] that an accommodation is unreasonable
> if it does not allow someone to perform his or her job
> duties in the present or in the immediate future.

*Id.* at 1314 (internal citations omitted). The Eleventh Circuit did acknowledge, however, that a prior decision had "parenthetically noted that more compelling facts might lead to a different result." *Id.* That decision provided the following hypothetical example: "[T]he ADA might be violated 'if an employee was terminated immediately upon becoming disabled without a chance to use his leave to recover.'" *Id.* (citation omitted).

Plaintiff was terminated six days after reporting a possible heart condition, arguably before he had a reasonable chance to determine if he was able to be cleared to drive by a cardiologist with or without further treatment. This is materially different from the situation in *Hudson* where the plaintiff had been allowed months to determine what the medical issue was, what limitations were imposed by the doctor, and what treatment was suggested, but nonetheless was not able to present the employer with information by the time of termination about how long it would be before she could perform the essential functions with the accommodation of leave to seek medical treatment.

Likewise, this is distinguishable from the situation in *Wood* where the plaintiff had been given extensive leave over the course of many years to treat the medical condition. It is not clear that no reasonable juror could find on the facts of the present case that the employer was moving forward as fast as possible to a termination decision before the employee could obtain a medical

Page 38 – OPINION AND ORDER

evaluation of what his condition was and how soon he could perform the essential functions of his position if given the reasonable accommodation of leave for medical treatment.    Thus, the "more compelling facts" dicta referenced in *Wood* are presented by this case.    Accordingly, there is a genuine issue of fact as to whether Plaintiff could have been accommodated through an allowance of time for medical care and treatment.

### c.    Prong Three: Causation

The third and final prong of a prima facie case requires Plaintiff to show that he suffered an adverse employment action because of his disability.    The parties do not dispute whether Plaintiff's termination would be considered an adverse employment action, but they do dispute whether an adverse action was taken because of Plaintiff's disability.    "In Oregon, '[e]vidence that permits an inference of discrimination' is sufficient for a plaintiff to make a prima facie case that she was discriminated against because of her disability."    *Snead*, 237 F.3d at 1089 (quoting *Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657 (1986)); *see also Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005) ("[T]he ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation—a motivating factor standard.")

Plaintiff has met his burden of proffering evidence which permits an inference of discrimination.    Defendant's only argument to the contrary is based on Plaintiff's testimony that neither he, nor Defendant, had any knowledge regarding "what was wrong with [him]" at the time of his termination.    (Ambrose Dep. 246:9–247:1.) Plaintiff's testimony does not foreclose the possibility that

Page 39 – OPINION AND ORDER

Defendant knew about Plaintiff's disability.  At the very minimum, the record suggests that: (1) Plaintiff was involved in an accident on December 30, 2011; (2) the casualty investigator contacted Defendant after he interviewed Plaintiff at the hospital and elicited information related to Plaintiff's history of heart-related issues; (3) Defendant was informed that Plaintiff could not drive until he was cleared by a cardiologist; and (4) Defendant terminated Plaintiff's employment six days later.  The timing of these events, coupled with the information that was received, permits an inference of discrimination.  That is sufficient to raise a genuine issue of fact as to the third and final element of Plaintiff's prima facie case of disability discrimination.

**2.    Beyond the Prima Facie Case: Burden-Shifting**

The Ninth Circuit applies the *McDonnell Douglas* burden-shifting framework to disability discrimination claims under the ADA.  *Weaving v. City of Hillsboro*, No. 10-CV-1432-HZ, 2012 WL 526425, at *4 (D. Or. Feb. 16, 2012).  Under that framework, once the employee establishes a prima facie case of disability discrimination, the burden shifts to the employer to provide some legitimate, nondiscriminatory reason for its allegedly discriminatory actions.  *Shepard*, 829 F. Supp. 2d at 963.  If the employer does so, the burden shifts back to the employee to demonstrate that the reason was pretext for discrimination.  *Weaving*, 2012 WL 526425, at *4.

Because Plaintiff has established a prima facie case of disability discrimination, Defendant must proffer a legitimate, nondiscriminatory explanation for terminating his employment, "i.e., one that 'disclaims any reliance on the employee's

Page 40 - OPINION AND ORDER

disability in having taken the employment action.'" *Curry County*, 451 F.3d at 1084 (quoting *Snead*, 237 F.3d at 1093). Defendant's safety review team determined that Plaintiff's improper rest and improper recognition of illness was the root cause of the accident, making it "preventable" and in violation of DOT regulations. The safety review team emphasizes that they were "aware that Plaintiff's cold was so bad that, even after twice taking over-the counter medication, he coughed so hard that he passed out and lost control of his truck." (Def.'s Mem. Supp. at 27.)

The evidence in the record that raises a material issue of fact that Defendant's proffered non-discriminatory reason is a pretext includes the evidence referred to above at page forty-one, lines ten through nineteen. The evidence of discrimination can also serve to rebut the legitimate non-discriminatory reason for termination offered by Defendant. Who the jury believes is a classic material issue of fact here.

In addition, the emergency room doctor did "not believe that simple coughing should cause syncope" and questioned whether Plaintiff experienced a "recurrence of his dysrhythmia." (Ohman Back Decl. Ex. B at 22.) The evidence in the record suggests this information was available to Defendant at the time of termination.

Absent a "few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Id.* (quoting *Humphrey*, 239 F.3d at 1139-40). "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge

Page 41 - OPINION AND ORDER

1  for performance inadequacies resulting from that disability."
2  *Humphrey*, 239 F.3d at 1140.

3      The Ninth Circuit has, for example, "found that there was a
4  sufficient causal connection between the employee's disability and
5  termination where the employee was discharged for excessive
6  absenteeism caused by migraine-related absences." *Id.* (citing
7  *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 875 (9th Cir. 1989)).
8  Similarly, the Ninth Circuit has found that there was a sufficient
9  causal connection between the employee's disability and termination
10 where the employee was discharged for absenteeism and tardiness
11 caused by obsessive compulsive disorder. *See id.* (holding that "a
12 jury could reasonably find the requisite causal link between a
13 disability of OCD and [the employee]'s absenteeism and conclude
14 that [the employer] fired [the employee] because of her
15 disability.")

16     Along similar lines, the employer in *Curry County* appeared to
17 argue that the employee's "misconduct, if not resulting from his
18 disability, stemmed from his failure to take proper precautions in
19 light of his [epilepsy]." *Curry County*, 451 F.3d at 1084 n.4. The
20 Ninth Circuit was not persuaded by such an argument: "[A]n employer
21 could just as easily say that excessive absenteeism was caused by
22 an employee's failure to arrive at work regardless of his migraine
23 headaches, or regardless of his obsessive compulsive disorder.
24 Thus, we think that the case law does not sustain this
25 distinction." *Id.* (internal citations omitted).

26     If the finder of fact determines Plaintiff's accident resulted
27 from his disability, as the emergency room doctor's report
28 suggests, Defendant's explanation would, as a matter of law, fail

Page 42 - OPINION AND ORDER

to qualify as a legitimate, nondiscriminatory explanation for Plaintiff's discharge. *See Curry*, 451 F.3d at 1084. Accordingly, the Court denies Defendant's motion for summary judgment on Plaintiff's disability discrimination claim.

### 3. Interactive Process

Ninth Circuit case law makes clear that employers bear "an affirmative obligation to engage in an interactive process in order to identify, if possible, a reasonable accommodation that would permit [an employee] to retain his employment." *Id*. at 1088. "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." *Humphrey*, 239 F.3d at 1137. When an employer fails to "engage in any such process, summary judgment is available only if a reasonable finder of fact must conclude that there would in any event have been no reasonable accommodation available.'" *Curry County*, 451 F.3d at 1088 (citation omitted).

Defendant does appear to claim that it engaged in any interactive process, good faith or otherwise. Under these circumstances, and in light of the rulings described above, summary judgment would be inappropriate since a reasonable jury could conclude the interactive process should have been used and could also conclude that process would have found a reasonable accommodation was available.[10]

_____

[10] Plaintiff erroneously brought an independent cause of action for failure to engage in interactive process. In *Kramer v. Tosco Corp.*, 233 F. App'x 593 (9th Cir. 2007), the employee appealed an unfavorable jury verdict in his action alleging disability discrimination under the ADA and Oregon law. *Id*. at 595. In

Page 43 - OPINION AND ORDER

**C.   Workers' Compensation Discrimination**

Defendant moves for summary judgment on Plaintiff's claim for workers' compensation discrimination on the grounds that: (1) Plaintiff did not invoke the workers' compensation system, which in turn defeats Plaintiff's ability to show a causal link between his use of the system and an adverse employment action; and (2) Plaintiff cannot establish that Defendant's reason for terminating his employment was pretext for discrimination.

Under ORS 659A.040, "[i]t is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has . . . invoked or utilized the procedures provided for in ORS chapter 656." OR. REV. STAT. § 659A.040. "To establish a prima facie case of injured worker discrimination, a plaintiff must show that (1) he invoked the workers' compensation system; (2) he was discriminated against in the tenure, terms or conditions of his employment; and (3) the discrimination was caused by the employee's invocation of workers' compensation." *Shepard*, 829 F. Supp. 2d at 962.   The *McDonnell Douglas* burden-shifting framework applies if the plaintiff establishes a prima facie case of workers' compensation discrimination. *Id.* (citing *Snead*, 237 F.3d at 1092-93).

---

rejecting one of the employee's assignments of error, the Ninth Circuit stated: "[Plaintiff]'s proposed instruction would have misled the jury into erroneously believing that there existed an independent cause of action for failing to engage in the interactive process. [Plaintiff's employer] is not liable because, as the jury found, [he] was not a qualified individual, with or without reasonable accommodation." *Id.* at 596.

Page 44 - OPINION AND ORDER

1    Defendant's first argument——which challenges the first and
2    third elements of Plaintiff's prima facie case——is easily resolved.
3    Under Oregon law, a claimant is not required to provide a formal
4    written notice of an injury or disease; rather, the workers'
5    compensation system can be invoked by "a worker's reporting of an
6    on-the-job injury or a perception by the employer that the worker
7    has been injured on the job or will report an injury." *Herbert v.*
8    *Altimeter, Inc.*, 230 Or. App. 715, 726 (2009). When viewed in the
9    light most favorable to Plaintiff, the record suggests that his
10   December 30, 2011 telephone call to Defendant's safety department
11   satisfies the *Herbert* standard.

12   Plaintiff's phone call December 30th and the report Defendant
13   received from its investigator LaLande shows Defendant knew (1)
14   there had been a serious accident, (2) Plaintiff had ridden in an
15   ambulance to the hospital for which there would be a "medical
16   bill," (3) Plaintiff had been examined at the hospital and had some
17   injury due to the seatbelt, again with an anticipated medical bill
18   from the emergency room visit, and (4) Plaintiff would be off work
19   unable to drive until he was checked out by a cardiologist
20   suggesting possible time loss.

21   To extent Defendant suggests that a compensable injury is a
22   prerequisite to invoking the workers' compensation system, the
23   Court is not persuaded by the argument.  As a general matter, the
24   Oregon Workers' Compensation Board "routinely addresses questions
25   regarding the compensability of workplace injuries," *Panpat v.*
26   *Owens-Brockway Glass Container, Inc.*, 334 Or. 342, 347 (2002), and
27   in some instances, courts must address whether a workers'
28   compensation case requires the invocation of the doctrine of

Page 45 - OPINION AND ORDER

"primary jurisdiction," *see id.* The doctrine of "primary jurisdiction" provides that, "where the law vests in an administrative agency the power to decide a controversy or treat an issue, the courts will refrain from entertaining the case until the agency has fulfilled its statutory obligation." *Boise Cascade Corp. v. Bd. of Forestry*, 325 Or. 185, 191 n.8 (1997). Neither parties' briefing adequately discuss these matters.

Moreover, the Oregon Court of Appeals' decision in *Parker v. Fred Meyer, Inc.*, 152 Or. App. 652 (1998), suggests that ORS 659A.040 would not condition an employer's liability for workers' compensation discrimination on a prior determination of compensability. In *Parker*, the employee appealed the grant of his employer's motion for summary judgment on workers' compensation retaliation and disability discrimination claims, arguing that the trial court erroneously gave issue preclusive effect to statements made by an administrative law judge ("ALJ") in the course of evaluating whether his injury was compensable. *Id.* at 654-55. In the rejecting the employer's argument, the Oregon Court of Appeals stated:

> [T]here is nothing inconsistent in an employer reasonably believing that a worker has not suffered an injury and also terminating the worker for having filed a workers' compensation claim. In other words, an employer may be motivated to fire a worker because the worker intends to file a valid claim or because the worker intends to file an invalid claim. Either action would violate ORS 659.410[, now renumbered as ORS 659A.109].

*Id.* at 1274.[11]

_____

[11] ORS 659A.109 uses language quite similar to that of ORS 659A.040. *See* OR. REV. STAT. § 659A.109 ("It is an unlawful employment practice for an employer to discriminate against an

1    Defendant next argues that, "[a]s with Plaintiff's disability
2    discrimination theory, he cannot establish that [Defendant]'s
3    legitimate, nondiscriminatory reason for his termination [was
4    pretext for discrimination]." (Def.'s Mem. Supp. at 34.)    As
5    discussed above, the Court has concluded that there is a genuine
6    issue of fact as to whether Defendant's explanation constituted a
7    valid nondiscriminatory explanation, which obviated Plaintiff's
8    need to demonstrate that Defendant's explanation was mere pretext.
9    Absent an explanation or argument as to why that conclusion should
10   not apply with equal force here, Defendant is not entitled to
11   summary judgment on Plaintiff's claim for workers' compensation
12   discrimination. *See Mihailescu v. Marysville Nursing Home*, No. CV
13   06-1187-HU, 2007 WL 4270751, at *15 (D. Or. Dec. 3, 2007)
14   (concluding that the court's ADA analysis "applie[d] equally to the
15   worker's compensation claim.")

16   **D.    After-Acquired Evidence**

17   Defendant argues that the doctrine of after-acquired evidence
18   is a complete bar to recovery and thus it is entitled to summary
19   judgment on all of Plaintiff's claims. (Def.'s Mem. Supp. at 15.)
20   Alternatively, Defendant argues that Plaintiff cannot recover
21   damages after September 7, 2012, when it discovered that Plaintiff
22   made material misrepresentations to Defendant and the DOT medical
23   examiner regarding his past medical history.

24

25

26
     _____

27   individual with respect to hire or tenure or any term or condition
     of employment because the individual has applied for benefits or
     invoked or used the procedures provided for in ORS 659A.103 to
28   659A.145.")

Page 47 - OPINION AND ORDER

1    Defendant is not entitled to summary judgment on the basis of
2    after-acquired evidence.  In *Schnidrig v. Columbia Machine, Inc.*,
3    80 F.3d 1406 (9th Cir. 1996), the employee appealed the district
4    court's grant of summary judgment on his action under the Age
5    Discrimination in Employment Act ("ADEA").  *Id.* at 1408.  The
6    employer argued that, even assuming there was a genuine issue of
7    fact as to whether it discriminated on the basis of age, summary
8    judgment was still appropriate based on after-acquired evidence.
9    *Id.* at 1412.  The Ninth Circuit rejected the employer's argument:

10           The Supreme Court [has] held that the use of
11    after-acquired evidence of wrongdoing by an employee that
      would have resulted in their termination as a bar to all
      relief for an employer's earlier act of discrimination is
12    inconsistent with the purpose of the
      ADEA. . . . Therefore, although [the employer]'s
13    discovery of after-acquired evidence may bear upon the
      specific remedy to be ordered, it does not warrant the
14    granting of summary judgment.

15    *Id.* (internal citations omitted); *see also Rooney v. Koch Air, LLC*,
16    410 F.3d 376, 382 (7th Cir. 2005) (seeing no distinction between
17    ADEA and ADA claims for the purposes of the after-acquired evidence
18    doctrine); *Burkhart v. Intuit, Inc.*, No. CV-07-675-TUC-CKJ, 2009 WL
19    528603, at *12 (D. Ariz. Mar. 2, 2009) (stating that "the use of
20    after-acquired evidence of wrongdoing to [completely] bar relief
21    for an employer's act of discrimination is . . . inconsistent with
22    the purpose of the ADA.")

23           Similarly, in *Seegert v. Monson Trucking, Inc.*, 717 F. Supp.
24    2d 863 (D. Minn. 2010), the employer argued that after-acquired
25    evidence of material misrepresentations on the employee's DOT
26    health history form rendered him unqualified for the commercial
27    truck driver position and thus acted as a complete bar to his
28    recovery.  *Id.* at 867.  The *Monson* court concluded that such an

Page 48 - OPINION AND ORDER

argument had been rejected by the Supreme Court.  *Id.* at 868

(citing *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 358

(1995)).  As *Monson* explained:

> Although *McKennon* dealt with only [on-the-job
> misconduct], each Circuit that has confronted the issue
> has extended *McKennon's* holding to include . . . cases in
> which the after-acquired evidence concerns an employee's
> alleged misrepresentation in the job application
> process . . . . While the Eighth Circuit has not
> expressly ruled on this issue, Defendant provides no
> authority . . . and the Court is aware of none, in
> support of departing from the holdings of the other
> circuits.
>
> Therefore, misconduct by [the employee], which [the
> employer] learned of post-termination, does not act as a
> complete bar to his [ADA and FMLA] claims or [Minnesota
> Human Rights Act] claim but may be used to limit [his]
> remedy.

*Id.* at 868-69 (citations omitted).  *Monson* went on to reject the

employer's contention that the after-acquired evidence could

support summary judgment in its favor on the employee's ADA claim.

*Id.* at 870.

        Consistent with *Schnidrig* and *Monson*, the Court concludes that

the doctrine of after-acquired evidence does not operate as a

complete bar to recovery, nor does it entitle Defendant to summary

judgment on all claims.

        Defendant is correct, however, that Plaintiff's remedy can be

limited under the doctrine:

> [A]fter-acquired evidence of wrongdoing generally limits
> an employee's remedy in three significant ways. If an
> employer discovers that the plaintiff committed an act of
> wrongdoing and can establish that the 'wrongdoing was of
> such severity that the employee in fact would have been
> terminated on those grounds alone if the employer had
> known of it at the time of the discharge,' the employer
> does not have to offer reinstatement or provide front
> pay, and only has to provide backpay 'from the date of
> the unlawful discharge to the date the new information
> was discovered.'

Page 49 - OPINION AND ORDER

*O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759 (9th Cir. 1996) (citation omitted).   In order to impose such limitations, an employer must: "(1) present after-acquired evidence of an employee's misconduct; and (2) prove by a preponderance of the evidence that it would have [in fact] fired the employee for that misconduct." *Wilken v. Cascadia Behavioral Healthcare, Inc.*, No. CV 06-195-ST, 2008 WL 44648, at *4 (D. Or. Jan. 2, 2008).

For the purposes of the pending motion, Defendant relies on Plaintiff's allegations and admissions, which includes, *inter alia*, claims that Plaintiff informed Nucci of the 2005 incident, the 2006 incident and the catheter ablation procedure.   This raises a material issue of fact as to whether Defendant would have in fact fired Plaintiff.   *See O'Day*, 79 F.3d at 759 (recognizing the inquiry "reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not.")   This issue should be decided by the jury.   Thus, Defendant's motion on after-acquired evidence should be denied and left for trial.

### V. CONCLUSION

For the reasons stated, Defendant's motion (Docket No. 32) for summary judgment is granted in part and denied in part.

IT IS SO ORDERED.

Dated this __13th__ day of February, 2014.

/s/ Dennis J. Hubel

_____
DENNIS J. HUBEL
United States Magistrate Judge